Kenneth S. Roosa
Cooke, Roosa & Valcarce
3700 Jewel Lake Road
Anchorage, AK 99502
Phone: (907) 276-2744
Facsimile: (907) 276- 2746
Ken@Bushlawyers.com

Attorneys for Aggie Waskey

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| AGGIE WASKEY and WASSILIE WASKEY, Individually and as Parents of RONALD WASKEY, a Minor, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA <br><br> Defendants. | Case No. 3:04-CV-110-JWS <br><br><br><br><br> <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u> |

Plaintiffs, Aggie Waskey, individually and on behalf of their son Ronald Waskey, a minor, through counsel, and pursuant to Rule 56(b), Federal Rules of Civil Procedure, hereby move for partial summary judgment against the United States on the issues of liability and causation. Based upon the record in this case, and the attached exhibits and deposition excerpts, there is no genuine issue as to any material fact relating to the negligence consequent liability of the defendant, or the causal connection between the

defendant's negligence and plaintiffs' injuries.   Accordingly, plaintiffs are entitled to summary judgment as a matter of law.

## I. SUMMARY AND INTRODUCTION

Aggie and Wassilie Waskey are the parents of minor Ronald Waskey.  Ronald was born on June 2, 1989 and is now 17 years old.  Aggie Waskey was raised in Stony River, Alaska, and married Wassilie Waskey, who is from Crooked Creek.   The alleged negligent care occurred during the time period that Wassilie and Aggie Waskey resided in Crooked Creek.

Ronald Waskey had visibly-discolored (tea colored) urine in October, November, and December of 1997, when he was 8 years old.  The discoloration was the result of blood in his urine.  On each instance health care professionals diagnosed him as having urinary tract infections, and he was given antibiotics for his "urinary tract infections."

In March of 1998 Ronald again developed blood in his urine.  This time he was seen by Dr. Lyons, a Doctor of Osteopathy, who recognized that Ron (then age 9) might have a serious kidney condition.  He ordered a four-stage work-up, which included being seen by kidney specialists in Anchorage. (Exhibit 1)    Unaccountably, the specialty consult never occurred, and the actual cause of Ronald's kidney problems was undiagnosed and essentially untreated for the next 5 years.  Although Ronald continued to demonstrate blood in his urine after the March 1998 visit with Dr. Lyons, he was repeatedly treated for urinary tract infections late in 1998 and into 1999, despite the fact that lab testing never showed the presence of an infection in his urine.

In July of 2003, Ronald was brought in for medical treatment because he was suffering from lymphadenitis of the neck, intermittent periorbital edema, hypertension, hypoalbumenia[1], hematuria and proteinuria[2].     A kidney biopsy demonstrated Membranoproliferative Glomerulonephritis type II (MPGN type II) and a pathology report concluded that by early July of 2003 approximately 20% of Ronald's glomeruli[3] were permanently destroyed. (Exhibit 2).  According to the consult report prepared by Dr. Gitomer on July 7, 2003, following episodes of painless hematuria in 1988 (sic), he was "lost to followup" between 1998 and 2003. (Exhibit 3).

There was a significant and medically unjustifiable delay in the diagnosis and subsequent treatment of Ronald's MPGN type II, and experts for both sides in this lawsuit agree that the delay in treatment caused permanent injury to Ron's kidneys.

Summary judgment as to liability and causation, but not quantum of damages, is appropriate at this time.  There are no material issues of fact with respect to the alleged negligence of the United States nor as to the fact that such negligence caused damage to Ron Waskey.  The amount of damage is contested, and is an appropriate focus for trial.

## II.     PROCEDURAL BACKGROUND

On May 25, 2004, Plaintiffs filed the instant lawsuit against the United States, alleging medical malpractice by various employees of the United States who provided medical services to Ronald Waskey, a minor, at the Yukon Kuskokwim Health Corporation ("YKHC") in Bethel, Aniak, and Crooked Creek, Alaska.

1     Albumen wrongly excreted in urine, a sign of kidney failure.
2     Protein in the urine, also associated with kidney disease.
3     Glomeruli are the network of microscopic blood structures in the kidneys, responsible for filtering waste from the blood.

A Minute Order from Chambers was entered for Early Neutral Evaluation pursuant to D.AK.LR 16.2 (C) on September 15, 2004.  The United States filed a Notice Declining to Participate on September 28, 2004.  The Initial Case Status Report and Case Scheduling and Planning Order was entered on September 29, 2004 and a Scheduling and Planning Conference Report was filed on October 27, 2004.  The report set the Pre-Discovery Disclosures and Preliminary Witness List exchange date on November 30.  All discovery was to be completed by May 27, 2005.  Expert Reports and Final Witness Lists were due by April 22, 2005.

On November 21, 2005, the parties filed a Stipulation regarding the Pre-trial Schedule and agreed to the following dates:  The exchange of Expert Reports was extended to February 26, 2006, Final Witness Lists due by March 3, 2006, Close of Discovery on April 21, 2006 and Dispositive Motions, Discovery Motions and Motions in Limine due May 12, 2006.  The Court approved this Stipulation on November 23, 2005.

On April 7, 2006, the parties filed another Stipulation to Extend Pre-trial Deadlines as follows:  Exchange of Expert Reports due May 15, 2006, Final Witness Lists due May 31, 2006 and Close of Discovery on July 14, 2006.

On October 17, 2006, Plaintiffs moved the Court to extend deadlines for Dispositive Motions to November 17, 2006.  And, on October 19, 2006, the Court granted Plaintiffs' Motion.

Depositions of Ronald, Wassilie, and Aggie Waskey have been taken.  Expert witnesses Dr. Jeremy Gitomer, Dr. Sharon Andreoli, Dr. Anthony Portale, and Dr. Roy Lyons have been deposed.  In addition, the depositions of damages witnesses Jill Friedman and Carol Jacobsen[4] have been taken.  All expert discovery deadlines in this case concerning the completion of medical expert discovery have now expired.

## III.  LEGAL STANDARDS AND APPLICABLE LAW

### A. Standard for Summary Judgment

Summary judgment is a procedure "properly regarded not as a disfavored short cut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'".  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Federal Rule of Civil Procedure 1 and citing Schwartzer *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 467 (1984)).

In *Celotex*, *supra*, the United States Supreme Court held that, when moved for, summary judgment must be entered against a party who bears the burden of proof at trial and who, after adequate time for discovery has passed, fails to establish the existence of an element essential to that party's case.  The Court stated:

> Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of genuine fact and that the moving party is entitled to judgment as a matter of law."  In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

---

4    At her deposition on September 22, 2006, Carol Jacobsen stated that she had within two weeks prior to her deposition been asked by counsel for the United States to prepare a supplemental report, detailing future medical costs as measured by Medicare reimbursement.  No such report has yet been submitted.

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact,"  since a complete failure of proof concerning an essential element on the non-moving party's case necessarily renders all other facts immaterial.   The moving party is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.... <u>Celotex</u>, 477 U.S. at 321.

The converse of *Celotex* is obvious – where there is no issue of material fact because the essential elements of a claim are undisputed, summary judgment *in favor* of a party who bears the burden of proof at trial is equally appropriate. Under Alaska law, summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u>, <u>B.R., v. State of Alaska, Department of Corrections</u>, ---P.3d----, 2006 WL 2789378 (Alaska), September 29, 2006; <u>See</u> <u>also</u>, <u>Hymes v. Deramus</u>, 119 P.3d 963 (Alaska, August 26, 2005).   The party seeking summary judgment must make a prima facie showing that he or she is entitled to judgment on the established facts as a matter of law.  Once this is done, the opposing part must demonstrate that a genuine issue of mater fact exists to be litigated by showing that it can produced admissible evidence reasonably tending to dispute the movant's evidence. <u>See</u>, <u>Harrold v. Artwohl</u>, 132 P.3d 276, (Alaska, March 31, 2006)(citing, <u>French v. Jadon, Inc.</u>, 911 P.2d 20, 23 (Alaska 2005); <u>Sonneman v. State</u>, 969 P.2d 632, 635 (Alaska 1998).

Because the pleadings, depositions, and admissions on file in this case, show that there is no genuine issues of material fact, Plaintiffs are entitled to partial summary

judgment as a matter of law as to the existence of a duty to provide adequate medical care to Ronald Waskey, a breach of that duty (failure to reasonably act to diagnosis his disease), and damage to him as a result of the breach.

### B. Legal Issues

At issue at this juncture is whether there is sufficient evidence to permit a conclusion that there is no material question of fact as to any element of the case other than the quantum of damages. The Plaintiffs claims assert that, (1) medical personnel employed by YKHC, Inc., including doctors, physicians' assistants, nurse practitioners, and health aides employing in Bethel, Aniak, and Crooked Creek, Alaska, were negligent in providing medical care to Ronald by failing to timely diagnose and treat his type II MPGN, and (2) that the delay in treating Ronald's MPGN more likely than not, caused permanent damage to his kidneys.

No further evidence need be adduced for the Court to conclude that Plaintiff is entitled to summary judgment as to liability and causation. Defendant's own expert, Dr. Portale, has conceded that there was an inexcusable delay in diagnosis and that the delay caused damage to Ron's kidneys. Plaintiffs are entitled to partial summary judgment as to liability and causation as a matter of law.

### C. Applicable Law

Under the Federal Tort Claims Act ("FTCA"), the United States is liable in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. The laws of the state where the negligent act is alleged to have occurred

is the appropriate law to apply in order to determine liability under the FTCA.  Richards v. United States, 369 U.S. 1, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962).   The allegedly negligent acts all occurred in Alaska.  Thus, Alaska law applies in this case.

### D. Burden of Proof

In order for Plaintiffs to meet their burden of proof in this case, they must present evidence establishing, 1) the relevant standard of care, 2) the government's negligence, and 3) that the Plaintiffs were actually harmed, and the government's negligence was a legal cause of Plaintiffs harm.  Therefore, a causal connection between YKDRH federal employees' alleged negligence and the Plaintiff's injuries must be shown.

In Alaska, negligence in a medical malpractice suit is defined as the failure to meet the standard of care.  Pursuant to AS 09.55.540, Alaska law defines the standard of care to be applied to health care providers as, the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendants were practicing.

Pursuant to AS 09.20.185, the standard of care should be determined on the basis of opinions offered by or testified to by expert witnesses.  A defendant fails to meet the standard of care if he or she either lacked the required degree of knowledge or skill, or failed to exercise the required degree of care.  The statute further provides that the standard of care is simply "the degree of care ordinarily exercised under the circumstances."  AS 09.55.540 (a)(1); see Abille v. United States, 482 F. Supp. 703, 705

(N.D. Cal. 1980) (applying Alaska law); <u>Baker v. Werner</u>, 654 P.2d 263, 268 (Alaska 1982).

In order to prove this by a preponderance of the evidence, the Plaintiffs must show that, 1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing, 2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and 3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. <u>See</u>, <u>Freitas v. Alaska Radiology Associates, Inc</u>., 80 P.3d 696, 700 (Alaska, 2003)  In summary, a physician has a duty to exercise the degree of skill and care expected of a reasonably prudent person acting in the same or similar circumstances at the time of the care in question.   And, failure to exercise such skill and care is negligence. <u>See</u> <u>id</u>. at 702.

Once it is determined that the government was negligent, the Plaintiff must prove that the negligence was the legal cause of the plaintiffs harm.  Alaska law defines legal cause or a legal cause of harm, as an act or failure to act which is a substantial factor in bringing about the harm.  That is, if it is more likely true than not true that:

(1)     the act or failure to act was so important in bringing about the harm that a reason-
        able person would regard it as a cause and attach responsibility to it; and

(2)     the harm would not have occurred but for the act or failure to act.

See, Sharp v. Fairbanks North Star Borough, 569 P.2d 178, 181 (Alaska 1977); State v. Abbott, 498 P.2d 712, 727 (Alaska 1972); See also, Restatement (Second) of Torts § 430 and comment d, § 431 and comment a (1965), as cited in Sharp v. Fairbanks North Star Borough, 569 P.2d at 181, and in State v. Abbott, 498 P.2d at 727. The latter provisions are also cited in Vincent By Staton v. Fairbanks Memorial Hospital, 862 P.2d 847, 851 (Alaska 1993); in City of Fairbanks v. Nesbett, 432 P.2d 607, 610-11 (Alaska 1967), the supreme court stated that it is not necessary for the actor's conduct to be "the" legal cause of an injury; it is only necessary that such conduct be "a" legal cause.

## IV.    STATEMENT OF UNCONTESTED FACTS

In October, November, and December of 1997 Ronald Waskey had gross hematuria (urine visibly-discolored by blood, seen as red, tea or coca-cola colored) that was diagnosed as an urinary tract infection at the YKDRH, and was treated with an antibiotic.

In March of 1998 Ronald again developed gross hematuria.  It was recommended that he be seen at the YKHC Sub-Regional Clinic in Aniak, Alaska.  Later in March 1998, Ronald was seen in Aniak by Dr. Lyons who, after discussion with the Urology Department at ANMC, ordered an appropriate work-up for recurrent episodes of painless gross hematuria with negative urine cultures.

Dr. Lyons' four stage work-up order (Exhibit 2) required that Stage I be conducted at the Crooked Creek Village Health Clinic.  Stage II was to be conducted at the Aniak Sub-Regional Clinic.    Stage III required a renal ultrasound and a voiding

cystourethrogram (VCUG) to be conducted at the YKDRH in Bethel.  The first three stages were planned to set the stage for the last and most critical Stage IV.  Stage IV was to be conducted at the Alaska Native Medical Center located in Anchorage, Alaska, and was intended to include consultation and referral to Urology and Nephrology.  Dr. Lyons ordered that each stage be completed and that he be made aware of the results.

Although stages I, II, and III were apparently completed, no diagnosis was reached, no cause for the bloody urine was found, and unfortunately Ronald saw neither an urologist nor a nephrologist.  During the following year and a half (1998 and 1999) Ronald was seen on several occasions for hematuria.  Despite negative urine cultures and a history that was not consistent with recurrent urinary tract infections, Ronald was treated for urinary tract infections during this time period, and did not receive an appropriate diagnostic work-up or any treatment for his underlying condition.  The medical records do not explain why or how Ronald was not referred to a kidney specialist.

In June 2003, when he had just turned 14, Ronald was brought into Anchorage for medical treatment unrelated to his previous kidney problems.  His primary symptom was lymphadenitis of the neck and intermittent periorbital edema (swelling around his eyes).  On examination and laboratory workup, it was learned that he also had hypertension (high blood pressure), hypoalbumenia[5,] hematuria and proteinuria[6].  The care providers in

5    Albumen wrongly excreted in urine, a sign of kidney failure.
6    Protein in the urine, also associated with kidney disease.

Anchorage quickly realized that Ron had a potentially serious disease, and referred him to a pediatric nephrologist, Dr. Jeremy Gitomer.

Ronald underwent a kidney biopsy in Anchorage in July 2003. The biopsied tissue demonstrated Membranoproliferative Glomerulonephritis (MPGN), type II, and the pathologist concluded upon microscopic review of the biopsied tissue that approximately 11 to 23% of Ronald's glomeruli[7] were irreversibly damaged. Dr. Gitomer reported that in July of 2003 Ron had lost approximately 25 to 30% of his glomerular filtration rate[8]. Ronald is currently receiving oral steroid therapy according to the protocol developed by Dr. Clark West (also known as the West protocol).

## V.    ARGUMENT

Plaintiffs have met their burden of proof with expert testimony at deposition, establishing the relevant standard of care existed and that the care provided to Ronald by federal employees failed to meet the requisite standard. Plaintiffs, through expert testimony have also established that this negligence was a causal factor with respect Ronald's injuries.

### 1.    Dr. Lyons

Testimony concerning the standard of care was provided in part by Dr. Lyons, formerly a physician for YKHC, and a treating physician for Ron Waskey in 1998. He testified[9] that in March of 1998 he ordered a four-stage treatment plan designed to allow for appropriate testing and diagnosis of Ron Waskey's urinary problems. Dr. Lyons

---

7    Glomeruli are the network of microscopic blood structures in the kidneys, responsible for filtering waste from the blood.
8         Exhibit 3, page 3.
9     See Deposition of Dr Roy Lyons, Exhibit 4.

agreed that Ronald did not get the care he needed. He testified that on February 25, 1998, he personally examined Ron Waskey, and he detailed his findings. (Lyons deposition p. 24: 20 through 27:24). He was concerned that Ron, at age 8, presented with gross hematuria, which was the reason he contacted the Anchorage hospital and got a listing of the workup he needed to do. (Lyons deposition 28:17-19; 31:15-25; 32:12 -22).

In discussing the rationale behind his four phase diagnostic workup, Dr. Lyons explained that those tests that could be performed in the village and in Aniak were to be performed first. The renal sonogram (the Bethel component) was designed to look for abnormal physiology that might be causing blood to enter Ron Waskey's urine. The renal ultrasound could not detect loss of kidney function. (Lyons deposition 44:1-16). The critical Anchorage portion of the workup was reserved for last, due to the expense associated with travel to Anchorage from remote villages.

He also testified that it was improper to continue to treat hematuria with antibiotics after the urine cultures were negative, as the appropriate way to proceed would be to first determine the cause of the blood in the urine. (Lyons deposition 50:1 though 51:3). Finally, Dr. Lyons testified that there was no reason apparent in Ron Waskey's medical records why he was not sent to Anchorage for specialty care in 1998, and that from his viewpoint it appeared that Ron Waskey's care just fell through the cracks in the system. (Lyons deposition 52:14 through 53:11).

## 2.    Dr. Portale

Dr. Anthony Portale, a pediatric nephrologist retained by the United States as its expert witness, testified[10] in his deposition that MPGN could be diagnosed at any age, including in young children, and that early therapy was preferred. (Portale deposition 12: 18-25; 14:5-14)  He stated that gross hematuria in children is usually bad, and that diagnosis of kidney disease is the responsibility of nephrologists, who conduct multiple tests until a cause for the hematuria is discovered. (Portale deposition 37:11 though 39:18).  He also testified that MPGN is always a part of his differential diagnosis in cases of painless gross hematuria of unknown origin, and that MPGN type II is a serious disease that in half or more of the cases results in kidney failure within  ten (10) years. (Portale 40:3 through 41:8).

Dr. Portale also testified about the standard of care, and whether it was met by health care providers in this case.  In the following deposition testimony, Dr. Portale, *the government's expert,* testified as to the requisite standard of care for diagnosis of pediatric kidney disease, and concluded that the care provided to Ronald Waskey was unacceptable.

```
    0060
    1     Q.  Do you think that his MPGN would have been
    2  diagnosed in 1998, had he been appropriately followed
    3  up?
    4     A.  If he had seen a nephrologist in 1998 it's
    5  possible that MPGN could have been diagnosed.  However,
    6  he had fairly low-grade proteinuria in April of '98 and
    7  it's not clear that a biopsy would have been done simply
    8  on the basis of that low-grade proteinuria.  It's
    9  conceivable that the nephrologist could have -- wanted
```

10   See deposition of Dr. Anthony Portale, Exhibit 5.

10  to follow that for a period of time.
11      Q.   Would you have expected that a nephrologist,
12  presented with a patient who'd had several unexplained
13  episodes of hematuria in a child that age, would have
14  maintained contact with the patient and done follow-up
15  in the future?
16      A.   That would be reasonable.

0063

6      Q.   The next time he's seen is on November 1st of
7  1999, again at the Crooked Creek Clinic for quote
8  "started peeing red, gradually getting worse," end
9  quote.  He again had a urinalysis that demonstrated
10  protein of 3 plus, blood about 250, was given -- was
11  assessed as having a urinary tract infection.  He was to
12  be given Rocephin, one gram three times -- times three
13  days intramuscularly and then Septra 40/200 by mouth
14  twice a day.  Urine cultures obtained, no growth.
15          Was this appropriate care for Ron's proteinuria
16  in November have 1999?
17      A.   You know, this is not too dissimilar to the
18  October '97 presentation, so on its own it's not
19  unreasonable, *but in the context of recurrent gross*
20  *hematuria, it's not appropriate*. (Emphasis added.)

0066

10      Q.   If you look at the totality of his records at
11  this point up until November of '99, is it not clear
12  that he had something more serious going on than
13  recurrent urinary tract infections?
14      A.   Yes.

0067

18          How would you describe Ron's condition with
19  respect to his kidney disease in July of 2003, Doctor?
20      A.   He had what we would call nephrotic syndrome at
21  that time.
22      Q.   Meaning that if he continued untreated what
23  would happen?

24     A.  Well, I'm not referring to that.  I'm saying
25   that the impression at the time was nephrotic syndrome.

0068

 1   The diagnosis wasn't clear and further testing needed to
 2   be done to establish a diagnosis, but one wouldn't
 3   necessarily -- well, needed -- further testing needed to
 4   be done to establish the diagnosis.
 5     Q.  Was it clear that he had a kidney disease at
 6   that point?
 7     A.  Yes.
 8     Q.  In your opinion letter you did not discuss the
 9   quality and care that Ron received prior to 2003;
10   correct?
11     A.  Correct.
12     Q.  Were you directed not to discuss that?
13     A.  No.
14     Q.  In your opinion did the care that Ron received
15   in 1997 and 2003 as the care for his proteinuria and
16   hematuria meet minimum standards of care?
17     A.  Some of it did.  However -- some of the care
18   was appropriate, but given the recurrent gross
19   hematuria, there wasn't a satisfactory explanation found
20   prior to the point that he was lost to follow-up.
21     Q.  And "lost to follow up" means what?  He fell
22   through a crack in the system and just didn't get what
23   he should have had?
24     A.  Well, I don't know that.  It's possible that he
25   was given appointments that he didn't keep.
0069
 1     Q.  Did you see that on the records?
 2     A.  Couldn't be located.
 3     Q.  But do you see any of that in the records; that
 4   he didn't keep appointments or was sent to places that
 5   he didn't go?
 6     A.  No.
 7     Q.  And Doctor --
 8     A.  The reason for his being lost to follow-up
 9   isn't clear one way or the other.
10     Q.  Dr. Lyons testified that as far as he could

11  tell and in his view, Ron just fell through a crack and
12  didn't get the care he should have had.  Is that
13  consistent with your reading of the records?
14      A.  I don't have an opinion on that because I don't
15  know that system.  I don't have any records that -- to
16  make a determination as to what happened to him.
17      Q.  Is it more likely than not that Ron had MPGN in
18  February of 1998?  I believe you've already answered
19  that question.
20      A.  Probably, yeah.
21      Q.  *And was it below the standard of care not to*
22  *pursue the cause and diagnose him in 1998?*
23      A.  *The standard of care is such that his*
24  *evaluation should have been pursued in a further attempt*
25  *to find the cause of his hematuria.*

Crucially, in the exchange quoted above, Dr. Portale acknowledges that Ron Waskey should have been followed in 1998 or early 1999 in order to determine the reason for his bloody urine at that time.  The requisite followup did not occur, and the standard of care was not met.  This is sufficient alone to justify summary judgment on negligence.  But that is not the end of the inquiry, nor was it the end of Dr. Portale's testimony.  In addition to negligence, plaintiffs are required to show that the negligent care resulted in –in legal terms *caused* -- injury.

Dr. Portale also addressed the causation issue at his deposition.  He testified that that the failure to timely diagnose and treat Ronald Waskey could affect his life expectancy, accelerate the date of his future renal failure, and probably caused him to suffer the loss of at least 10 per cent of his kidney filtration cells.  (Portale 78:15 through 80:4)  Dr. Portale also testified as follows:

0083

1  BY MR. ROOSA:

5   Q.  Do you think that a three to five-year delay in
6  diagnosis and treatment may accelerate the date or age
7  at which he experiences renal failure, if indeed he
8  does?
9   A.  I think it could.
10   Q.  And does age of onset of renal failure affect
11  your life expectancy?
12   A.  Probably.
13   Q.  Does it affect your ability to earn a living?
14   A.  Does what affect your ability to earn a living?
15   Q.  Earlier onset of renal failure?
16   A.  I don't know.

**3.     Dr. Gitomer**

Dr. Gitomer, an adult and pediatric nephrologist and Ron's current care provider in

Anchorage, testified at his deposition[11] that health care providers failed to timely

diagnose Ronald's disease, and that the delay in diagnosis was harmful to Ron's health.

He was clear that had Ron been seen in 1998, his condition would have been diagnosed

then and Ron would have started treatment five years earlier, before his kidneys were

seriously damaged by the disease.  Dr. Gitomer testified, at pages 91 through 93 of his

deposition, (emphasis added) as follows:

91
4   Q.  In your view should Ronald have been sent in for
5  more testing when they first -- to discover the protein
6  in his urine?
7   A.  Yeah, I -- yes.
8   Q.  And did you see the testing, the treatment
9  protocol, the protocol that was developed by his

---

11   See deposition of Dr. Jeremy Gitomer, Exhibit 6

10   physician that was apparently never followed through on
11   in the records?
12      A.  No.
13      Q.  Were you aware that a physician in Aniak
14   actually developed a five-stage treatment protocol that
15   included a consult with a nephrologist and that this was
16   developed in 1997?
17      A.  I didn't have that record.
18      Q.  If that protocol --
19        MR. GUARINO:  I'd object if you're going to
20      start asking him hypotheticals.
21        MR. ROOSA:  You can object, I'm going to ask
22      him.
23   BY MR. ROOSA:
24      Q.  If he had seen a nephrologist in 1997, do you
25   think that nephrologist could have determined the cause

                                    92
1   of his proteinuria?
2       A.  I have a 24-hour from 1998 which is abnormal.
3    The 24-hour urine in '97, or the protein was not
4    abnormal, it would not have been discovered.  In '98 a
5    pediatric nephrologist would have done a biopsy.  So I
6    can't say anything about '97, because I don't have the
7    data.
8       Q.  Had he been seen in '98, the disease would have
9    been discovered and would have inevitably been treated?
10      A.  Yes.
11      Q.  And using the same protocol that you used, more
12   likely than not?
13      A.  Probably, although everyone does different
14   things and medicine is an art.
15      Q.  But the protocol that you're using is the
16   standard of care?
17      A.  It's the standard if you look in the Up To Date,
18   which is the text that we use, you know, it is the
19   recommended, and this is -- Up To Date is a living
20   textbook that we frequently use.
21      Q.  Was it also in use in '98?
22      A.  No, it was not developed at that time.
23      Q.  When was it developed?

```
24      A.  Up To Date?
25      Q.  No, not Up To Date, the protocol --
```

                                    93
```
1       A.  Protocol's been around for 20 years.
2       Q.  Is it fair to say that if he had been put on
3   treatment five years earlier that his response would have
4   begun five years earlier, his response to the
5   medications?
6       A.  Yes.
7       Q.  And that he would have begun the medication
8   regimen with five years less kidney damage?
9       A.  Yes.
10      Q.  And that, therefore, the delay in treatment was
11  detrimental to the health of his kidneys and caused
12  damage to his kidneys?
13      A.  Yes.
14      Q.  Is a five-year delay in treatment standard of
15  care in your business?
16      A.  No.
17      Q.  It's not even close, is it?
18      A.  It's not ideal.
```

Finally, on the topic of whether any damage to Ron Waskey's health was caused

by the delay in his diagnosis and treatment, Dr. Gitomer testified (emphasis again added)

in the affirmative.  He stated:

                                    84
```
13    Q.  Big issue in this case is what if, what would
14  his condition be like if he had been biopsied in '97, '98
15  or '99 and had shown signs of the disease and had started
16  on a treatment regimen at that time?  I'm not asking for
17  you to speculate or go beyond what you can do from your
18  experience, but is there any way to predict retroactively
19  what Ronald's condition would have been in comparison to
20  what it is now if he had started treatment in '98 or '99
21  or 2000?
22    A.  The mantra in nephrology is if we catch it
23  early, we do better.  Early disease -- we caught it in
```

> 24  '98 when he had twice normal protein.  You would hope
> 25  that treatment would have been much easier.  One, his
>
> 85
>
> 1  blood pressure would not be nearly what it is now,
> 2  because he wouldn't have had all the damage he
> 3  accumulated over time.  There's no doubt his blood
> 4  pressure has gone up over the last five years.  That's
> 5  well documented.  I don't think his blood pressure would
> 6  have been as bad and I suspect it would have been easier
> 7  to treat him.
> 8      He has what we call a steroid-responsive disease
> 9  now.  He should have had steroid-responsive disease then.
> 10  There's no reason to think he wouldn't if he does now,
> 11  because that's actually unusual with this disease.  So I
> 12  would expect him to be steroid responsive.  So it would
> 13  have been easier to treat, it's pretty safe to say, on
> 14  more than just one account.  He's on six
> 15  anti-hypertensive medications, so he might have only
> 16  needed one.

Without even discussing the testimony of Dr. Andreoli, Plaintiff's nephrology expert, and relying solely on the testimony of the past treating physician (Dr. Lyons), the current treating nephrologist (Dr. Gitomer) and the United States' expert witness (Dr. Portale), plaintiffs have demonstrated the absence of any material issue of fact regarding negligence and causation.

### V. CONCLUSION

A review of the uncontested testimony by multiple physicians in this case leads to the inescapable conclusion that the care provided to Ron Waskey was inadequate and substandard.  His disease should have been diagnosed in 1998 or 1999 at the latest, but instead went undiagnosed and untreated until 2003.  In the interim he suffered permanent

kidney damage from the untreated progress of his disease. There is no issue of fact or divergence of opinion as to the negligence of care providers in diagnosing Ron Waskey's disease. According to Dr. Lyons, Ronald's care simply fell through the cracks in the system. Dr. Gitomer is clear in his testimony that the care provided to Ronald Waskey was too little too late. He should have been diagnosed in 1998 or at the latest 1999. Dr. Portale testified that by early 1999 Ron's disease should have been diagnosed, and the delay is unjustifiable and below standard. This delay was below the standard of care, caused at least some loss of kidney function, could reduce his ability to earn a living and could also accelerate his eventual kidney failure. According to Dr. Gitomer, the mantra of nephrology is early treatment. Unfortunately, early treatment did not occur in Ron Waskey's case – and it should have.

Nothing more is required for this Court to conclude that there is no issue of material fact with respect to the negligence of the care providers in failing to timely diagnose MPGN type II in Ronald Waskey. Further, it is uncontested that this negligence and the associated delay in treatment caused damage to the plaintiffs.

Just as clearly, the *amount* of damage is disputed by the United States and cannot be resolved by pretrial motion practice. Accordingly, the plaintiffs ask this Court to grant them partial summary judgment on negligence and causation, and to reserve the determination of damages for trial.

Respectfully submitted at Anchorage, Alaska this 1st of November, 2006.

COOKE, ROOSA & VALCARCE, LLC

Attorneys for Plaintiffs


s/ Kenneth S. Roosa
Cooke, Roosa & Valcarce
3700 Jewel Lake Road
Anchorage, AK 99502
Phone: (907) 276-2744
Facsimile: (907) 276- 2746
Ken@Bushlawyers.com
Alaska Bar No. 8306061

Attorneys for Aggie Waskey


**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2006, a copy
of the foregoing Motion for Partial Summary
Judgment was served electronically on:

Gary Guarino, Esq.
Assistant U.S. Attorney
222 W. 7th Ave., #9, Room 253
Anchorage, AK  99513

Donna McCready, Esq.
Ashburn & Mason, PC
1130 W. 6th Ave., Suite 100
Anchorage, AK  99501


/s/ Kenneth Roosa