Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

AGGIE WASKEY and WASSILIE )
WASKEY, Individually and )
as Parents of RONALD )
WASKEY, a Minor, )
 )
    Plaintiffs, )
 )
  vs. )
 )
UNITED STATES OF AMERICA, )
 )
    Defendant. )
_____)
Case No. 3:04-cv-0110-JWS

---

VIDEOTAPED DEPOSITION OF CAROL JACOBSEN

---

Volume I, Pages 1 - 70, inclusive

Friday, September 22, 2006
9:05 A.M.

Taken by Counsel for Plaintiffs Aggie and Ronald Waskey
at
COOKE, ROOSA & VALCARCE
3700 Jewel Lake Road
Anchorage, Alaska

Page 18

1   A.  A copy of her file?
2   Q.  Yes.
3   A.  Can I consult my --
4   Q.  Sure.
5   A.  I'm going to move here.
6   Q.  Let me help you out here, because this
7   looks like...
8   A.  This is a CD with her attachments on it,
9   and I received that -- August 31st it's post
10  stamped, so I'm assuming I got it a couple of days
11  later.
12  Q.  Okay. And who did you receive that from?
13  A.  Mr. Guarino.
14  Q.  Is there an enclosed -- a letter enclosing
15  that -- with that?
16  A.  This.
17  Q.  May I see that, please?
18  A.  Okay.
19      MR. GUARINO:  Can I see that?
20      MR. ROOSA:  You didn't sign it.
21      MR. GUARINO:  No. I just -- I don't remember
22  ever seeing it. Okay.
23  BY MR. ROOSA:
24  Q.  Did Mr. Guarino speak with you about Jill
25  Friedman's deposition?

Page 19

1   A.  I believe we spoke about it briefly.
2   Q.  And what did he tell you about it?
3   A.  Just that he'd taken her deposition, and
4   he'd reviewed her life care plan and gave me kind of
5   a condensed version of it.
6   Q.  Did he discuss with you his criticisms or
7   his -- kind of his impressions of her testimony or
8   her life care plan?
9   A.  Actually, he said she was very pleasant.
10  Q.  Well, that wasn't my question. Did he --
11  did he discuss with you any criticisms or
12  impressions of her life -- her life care plan?
13  A.  No, he didn't. He -- his comment, other
14  than factually, was that she was very pleasant.
15  Q.  Are you planning to do -- or have you been
16  asked -- either are you personally planning to do or
17  have you been asked to do any additional work on
18  this case?
19  A.  Yes, I have.
20  Q.  Okay. And who has asked you to do what?
21  A.  Mr. Guarino has asked me to do a
22  supplemental report on Medicare costs for dialysis
23  and transplant.
24      MR. ROOSA:  We're here to take her
25  deposition. Now you're telling me she's going to do

Page 20

1   another report?
2       MR. GUARINO:  Because we're having
3   difficulty, as you know, trying to get accurate
4   figures on what the Medicare costs are.
5       MR. ROOSA:  Gary, reports were due in July.
6       MR. GUARINO:  That's true.
7       MR. ROOSA:  And you retained her a year and a
8   half ago, and now you want to do another report. I'm
9   not going to depose her -- I don't plan to depose her
10  again.
11      MR. GUARINO:  I will certainly give you the
12  opportunity to. The pro- --
13      MR. ROOSA:  That's not the point.
14      MR. GUARINO:  Well, the point --
15      MR. ROOSA:  You don't have the right to keep
16  submitting reports ad infinitum.
17      MR. GUARINO:  Let's go off the record for a
18  second.
19      MR. ROOSA:  No, we're not going off the
20  record.
21      MR. GUARINO:  Well, let's stay on the record.
22  Until I got your report from Dr. Andreoli
23  that indicated how you had a theory as to what future
24  medical expenses were going to be necessary for
25  Ronald, I did not know, and I told you several times I

Page 21

1   did not know, how you were coming up with a theory
2   that said Ronald's care in the future was going to be
3   any different than it otherwise would have been, given
4   Dr. Gitomer's assessment up to that time. I knew what
5   your claim was. I did not know what your theory was.
6       Since we've gotten your report about what you
7   claim to be the dynamics of how he's going to need
8   dialysis and transplant in the future, that's fine. I
9   understand that theory now.
10      The only question was, what are those costs.
11  The attempt is to try and figure out what those actual
12  costs are, which we've told you in her report, and you
13  are unaware from the questioning, there are costs as
14  they're billed and there are costs from Medicare.
15  We're trying to get the costs from Medicare. Those
16  are the real costs that Ronald will face if he faces
17  those costs in the future. That's all we're trying to
18  do.
19      MR. ROOSA:  That's your theory.
20      MR. GUARINO:  Well, you can argue that --
21  against that. I don't say you're foreclosed from
22  arguing against that, but that's the only issue here
23  that's left, is to try and figure out what those costs
24  are.
25  BY MR. ROOSA:

Page 22

1  Q. We're going to do some work here today.
2  We're obviously not going to finish this deposition.
3  Is there anything else you're going to do other than
4  prepare a supplemental report that lists Medicare
5  costs?
6  A. No, not anything other than that.
7  Q. And when are you going to prepare this
8  report?
9  A. I can probably get it done in the next
10 couple of weeks. I mean, I'm in the process of
11 gathering information. It's hard to get, very hard
12 to get.
13 Q. And why are you looking for Medicare costs?
14 A. Because Mr. Waskey's diagnoses, ultimate
15 diagnoses of end-stage renal failure, he
16 automatically qualifies for Medicare benefits.
17 Q. How do you know that?
18 A. Because I've contacted people, and I've
19 read the literature and the Medicare booklet and --
20 Q. Are you an expert on qualification for
21 Medicare?
22 A. No, I'm not.
23 Q. Are you aware that Mr. Waskey has to
24 independently qualify for Medicare before he can
25 become a Medicare recipient of renal benefits?

Page 23

1  A. Yes, I am aware of that.
2  Q. And why do you think that he will qualify
3  for Medicare?
4  A. Because I've met with the case manager at
5  Alaska Native Medical Center and I have talked to
6  the billing people over there, and they're telling
7  me that he will qualify. And they seem to be the
8  experts.
9  Q. And on what basis do they think he will
10 qualify? He has no work history.
11 A. Because of his diagnoses.
12 Q. So you -- it's your belief, based on what
13 you have been told, that all he has to do is walk in
14 and say, I'm an end-stage renal patient, and
15 Medicare will pay --
16 A. No.
17 Q. -- for his care?
18 A. No. It's not quite that simple. He does
19 need to fill out some forms, and he does need to
20 apply. And he does need to apply in a timely
21 fashion. But his diagnoses of end-stage renal
22 disease is what will qualify him for that benefit.
23 Q. Independent of any work history or any
24 payments into the Medicare system. That's what you
25 think?

Page 24

1  A. Well, that's what I have been told.
2  Q. And if you're wrong, if that's not correct,
3  then he is not a Medicaid (sic) recipient, correct?
4  He would not be --
5  MR. GUARINO: Object to foundation.
6  BY MR. ROOSA:
7  Q. -- eligible for Medicaid (sic).
8  MR. GUARINO: Object to foundation of that
9  question.
10 THE WITNESS: Well, if he doesn't meet the
11 criteria, then yeah. But I mean, it -- it says in the
12 Medicaid (sic) booklet, that you can print off the
13 Internet, that the diagnoses of end-stage renal
14 disease qualifies you.
15 BY MR. ROOSA:
16 Q. Before age 65?
17 A. Yeah. Okay.
18 Q. Okay.
19 A. Yeah.
20 Q. And you -- you -- can you sit here and tell
21 me of your own knowledge whether or not he is also
22 required to have a certain number of quarters of pay
23 into the Medicare health system?
24 A. Well, that's -- that's part of the
25 criteria. But if he doesn't work, he -- if he

Page 25

1  doesn't have the quarters, he -- he automatically
2  goes over to qualify.
3  Q. So you think that even if he has no
4  pay-ins, no quarters of significant pay-in to
5  Medicare, that he would still qualify?
6  A. That's the information that I'm getting
7  from the Alaska Native Medical Center.
8  Q. And in -- in the previous life care plans
9  that you have done, have you looked to Medicare as
10 the basis for the costing for services?
11 A. I have not. And you will see in my current
12 life care plan that I tried very hard to get the
13 present-day dollar or "walk in off the street" and
14 quantify that. And because those costs are covered
15 by Medicaid (sic), it was very difficult to pierce
16 that Medicaid (sic) void and try and get those
17 dollars.
18 MR. GUARINO: You mean -- excuse me. You
19 said Medicaid. Did you mean Medicaid or Medicare?
20 THE WITNESS: Medicare. I'm sorry.
21 Medicare.
22 BY MR. ROOSA:
23 Q. Well, I -- I understood you to be talking
24 about his prior -- his current and past care.
25 A. Current and past care. Well --

Page 26

1  Q. That was Medicaid (sic).
2  A. Right.
3  Q. Correct?
4  A. Yeah. And -- and in --
5  Q. And did you get the actual -- did you look
6  at actual costs for care to date, or not?
7  A. I don't think I got copies of bills.
8  Q. Why are you looking to Medicaid (sic) at
9  this point in -- in --
10 A. Medicare.
11 Q. -- in Medicare in this case? Why -- why
12 are you doing it?
13 A. Because his diagnoses of end-stage renal
14 disease is what is going to qualify him. And if --
15 if it was any other organ transplant, it's not
16 listed in the Medicare booklet.
17 Q. So this is -- you're telling us that, in
18 this case, this is the first time in -- in your
19 years as a life care planner that you have ever used
20 or been -- attempted to use Medicare as a basis for
21 com- -- computing costs. Is that right?
22 A. That's correct.
23 Q. Have you had cases involving Alaska Natives
24 before?
25 A. Yes.

Page 27

1  Q. Have you ever computed their costs based on
2  what the Alaska Native Medical Center will charge
3  them for their care?
4  A. No.
5  Q. Why not?
6  A. Oh, I may have used it, but not
7  exclusively.
8  Q. Well, have you had -- in the past, when
9  you've had patients who were on Medicaid (sic), have
10 you used Medicaid (sic) costs to calculate what
11 their actual futures will be?
12 A. No.
13 Q. Why not?
14 A. I have just never gotten copies of those --
15 sometimes I have gotten copies of the bills, but I
16 just look at what the shelf cost is.
17 Q. Do you know whether Medicaid (sic) will be
18 around -- excuse me -- Medicare --
19 A. Medicare.
20 Q. -- will be around in 50 years?
21 A. Well, I have no idea. I mean, I -- I don't
22 know.
23 Q. But Mr. Waskey may be around in 50 years,
24 right?
25 A. Hopefully so.

Page 28

1  Q. And if he's around, and his costs are
2  computed on the basis of a Medicare system that no
3  longer exists when he's 50, he's out of luck, isn't
4  he?
5      MR. GUARINO: Object. You're asking her to
6  speculate as to legal, and there could be national
7  health insurance in 50 years and it would be
8  irrelevant whether Medicaid (sic) is there.
9      MR. ROOSA: She can answer the question.
10     THE WITNESS: Well, I really don't know what
11 the -- the history of the health insurance is going to
12 be. I mean, I --
13 BY MR. ROOSA:
14 Q. The future, you mean.
15 A. I mean, yeah. I mean, I understand your
16 point, but this disease and ultimate treatment being
17 dialysis and -- potentially dialysis and potentially
18 kidney transplant, is -- is the only condition and
19 disease that I know that is stamped out clear in the
20 Medicaid (sic) system.
21 Q. And so your -- your view is that he's
22 required to go apply for Medicaid (sic) and use
23 Medicaid (sic) and that -- that he doesn't have any
24 choice as to what medical services he should use in
25 the future?

Page 29

1      MR. GUARINO: Excuse me. You -- you both
2  keep confusing -- using the word Medicaid.
3      MR. ROOSA: Medicare. I mean Medicare.
4      MR. GUARINO: Okay.
5  BY MR. ROOSA:
6  Q. Is your --
7  A. Correct.
8  Q. Is your -- is your -- so you're taking the
9  view that since he may qualify for Medicare services
10 that he has to use those?
11 A. No. I -- I'm saying that that -- once you
12 get in that system, that is the payment source that
13 people recognize and use. And I -- I think if
14 Mr. Waskey wanted to walk in and write a check for
15 his monthly dialysis treatment, I don't see that the
16 dialysis center would refuse him from doing that.
17 But if he's eligible for paying a lesser price or
18 receiving those benefits, and that's automatically
19 kind of the route that he gets put in, I don't see
20 why he would do that.
21 Q. Why -- so you're saying -- but do you know
22 what the -- let me ask you a different question. Do
23 you know what restrictions Medicare places on
24 treatment for dialysis patients?
25 A. What do you mean by "restrictions"?

Page 30

1    Q.  Well, do they do anything that the patient
2  or his attorn- -- his -- his doctor would like him
3  to do, or are there guidelines on how often they'll
4  do dialysis and what forms of dialysis they'll pay
5  for?
6    A.  Not to my knowledge.  I mean, they'll do
7  hemodialysis or pay for peritoneal dialysis.  And
8  I --
9    Q.  What about nocturnal dialysis?
10   A.  Nocturnal, in the evening?
11   Q.  At night.
12   A.  Like at home?
13   Q.  Yes.
14   A.  I don't know that I looked at that
15 specifically, but home units are available.
16   Q.  Do you know how many times a week you can
17 get dialysis if you're a Medicare patient?
18   A.  The information that I have is 13 times a
19 month is usually what the costs are based on.
20   Q.  And if he wished to have -- or his doctor
21 wished him to have it 16 times a month, do you know
22 if Medicare would pay the difference?
23   A.  I don't know that.  Those are things that I
24 haven't really figured out yet, because I'm just
25 starting to peel this onion.

Page 31

1    Q.  And so it's -- it's your -- it sounds like
2  it's your philosophy that if there's something free
3  that the government offers, you should go get it?
4    A.  Oh, I don't think I've said that.
5    Q.  Well, you said if he's eligible for
6  Medicare, he should -- he should apply for it
7  because it's available.
8    A.  Well, sure.  That's a possibility for him,
9  yeah.
10   Q.  What if -- do -- do you think that Medicare
11 exists to take the government off the hook or tort
12 feasors off the hook for injuries that they have
13 done to individuals?
14       MR. GUARINO:  I object.  This is beyond --
15 you're talking about issues of mitigation of damages
16 and requirements like that.  That's not within her
17 expertise.
18 BY MR. ROOSA:
19   Q.  If Mr. Waskey was working for VECO and was
20 injured because of the negligence of one of VECO's
21 subcontractors, and you were the life care planner
22 on this case, and he was looking at an injury to his
23 kidney that was going to cause renal failure, would
24 you think that the government should pay through
25 Medicare rather than the subcontractor paying for

Page 32

1  the injury that he did to an individual?
2    A.  Well, what I'm saying is that when you try
3  and get costs for treatment for dialysis and -- and
4  transplant, it's very difficult to get those costs,
5  because everybody goes into the Medicare system.
6  And if that system is available and those are the
7  actual costs, why would he not use that?
8    Q.  No, I'm not asking you that.  I'm asking
9  you what you would put in your life care plan, how
10 you would cost dialys- -- dialysis in -- in an
11 industrial accident case.
12   A.  Okay.  I have done the shelf life cost to
13 the best of my ability in the life care plan that I
14 have submitted.  I have been asked by Mr. Guarino to
15 now look at the Medicaid (sic) cost.
16   Q.  Exactly.
17   A.  So I am in the process of doing that.  And
18 I think that I will submit the cost to the best of
19 my ability, just like I have submitted the costs to
20 the best of my ability of what the walk-in costs
21 are, and then it's up to the judge or the jury or
22 whomever --
23   Q.  Thank you.
24   A.  -- to decide.
25   Q.  My point is that you have never used

Page 33

1  Medicaid or Medicare costs as the basis for life
2  care plan until you were asked in this case to do so
3  by Mr. Guarino, correct?
4        MR. GUARINO:  Because she hasn't dealt with
5  end-stage renal failure before.
6        MR. ROOSA:  Are you going to answer for her,
7  or are you going to let her answer the questions,
8  Counsel?
9        MR. GUARINO:  Go ahead.
10       THE WITNESS:  No, I have not.  And I have
11 never dealt with a case where, if you look at the
12 literature and the book, it's -- and try and get
13 costs, it's where it all goes, is to the Medicare.
14 BY MR. ROOSA:
15   Q.  You didn't use Medicare as a basis in --
16 for your life care plan, did you?
17   A.  I did not.
18   Q.  You knew, when you were writing your life
19 care plan, that Medicare was a big player in renal
20 treatment, correct?
21   A.  Yeah.  It was difficult to -- to find out
22 what the actual costs were because of that.
23   Q.  And yet it wasn't until after you submitted
24 your life care plan to Mr. Guarino that he asked you
25 to look at Medicare costs, correct?

Page 34

1  A. In detail, that's correct. I mean, I knew
2  they were look there, and I looked at them as part
3  of my plan, because they're there.
4  Q. So -- so this whole Medicare business is
5  something you have been asked to do by an attorney,
6  not something that you normally do in the course of
7  your work?
8  A. Well, I've -- I've looked at it before.
9  But once again, I've never had a diagnosis and a
10 condition that is specific to Medicare.
11 Q. You have said that.
12 A. Yeah.
13 Q. I want you to answer my question, not the
14 question that you want to answer. The question
15 was --
16 A. Okay.
17 Q. -- you have never done this before, and you
18 only did it in this case because you were asked to
19 do so by an attorney.
20     MR. GUARINO: I object. That
21 mischaracterizes her testimony.
22     MR. ROOSA: Would you please read the
23 question back.
24     THE REPORTER: Question: "I want you to
25 answer my question" --

Page 35

1     MR. ROOSA: No. The one before that. I'm
2  sorry.
3     THE REPORTER: "So this whole Medicare
4  business is something you have been asked to do by an
5  attorney, not something that you normally do in the
6  course of your work?"
7     THE WITNESS: I may review Medicare and/or
8  Medicaid billing, if that is the primary provider when
9  I get bills or invoices in relation to an injury. But
10 routinely I do not look at that. And yes, Mr. Guarino
11 asked me to look at that.
12 BY MR. ROOSA:
13 Q. When did he make that request to you?
14 A. A couple of weeks ago.
15 Q. Did he do that in writing?
16 A. I don't think so.
17 Q. Did you have notes of that conversation, if
18 it was a conversation?
19 A. It was a telephone conversation. I may
20 have notes in my file.
21 Q. Can you look and see what you have?
22 A. Sure. Are you done with this?
23 Q. I don't know what that is. I took that out
24 just to facilitate your getting --
25 A. This is Ms. Friedman's file.

Page 36

1  Q. This is Ms. Friedman's file. Okay.
2  A. The CD, I just took it to Kinko's and had
3  it printed.
4  Q. So you had the CD printed?
5  A. Correct.
6  Q. Okay.
7  A. And that's what's in this box.
8  Q. I have seen her file, so I don't -- I don't
9  need to look at that anymore.
10 A. Okay.
11 Q. Let me put this down here so that you have
12 better access to your...
13 A. Looks like about the 5th of September,
14 approximately.
15 Q. What are you referring to there, ma'am?
16 I'm talking about the -- the file. What -- what is
17 in that? It looks like there's a lot of handwriting
18 in that part -- part of the file folder you're
19 looking at. What -- what is that?
20 A. This is just my working file with my notes
21 and --
22     MR. ROOSA: Okay. Let's -- let's -- let's go
23 off record. I would like to take a look at -- at the
24 file. I think there's some --
25     THE WITNESS: You bet.

Page 37

1     THE VIDEOGRAPHER: Going off the record at
2  approximately 9:48 a.m.
3     (Recess taken.)
4     THE VIDEOGRAPHER: We're on the record. The
5  time is approximately 9:54 a.m.
6  BY MR. ROOSA:
7  Q. Ms. Jacobsen, in your review of the medical
8  records of Ronald Waskey, did you find any
9  indication that he's a smoker?
10 A. I think he tried nicotine before; it was
11 documented.
12 Q. Does -- in your view, does that make him a
13 smoker?
14 A. I don't know if he's currently smoking or
15 not, but I think he experimented, as most teenagers
16 do.
17 Q. Do you see any evidence in the records
18 apart from that that he continues to smoke?
19 A. I haven't seen any, no.
20 Q. Have you seen any indication in the
21 deposition, in his -- his deposi- -- his mother's
22 deposition or his deposition that he's a smoker?
23 A. I don't recall that, no.
24 Q. Have you been asked to give any medical
25 opinions about the care he received prior to